IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

**ANGELO JAMES FRICANO**,

       Plaintiff,

      v.

**LANE COUNTY**, a municipal corporation;
**LANE COUNTY SHERIFF THOMAS
M. TURNER**, in his individual and official
capacity; **CORIZON HEALTH, INC**., a
Delaware corporation; and **JACOB PLEICH**,
in his individual and official capacity,

      Defendants.

_____

No. 6:16-cv-01339-MC

**OPINION AND ORDER**

**MCSHANE, Judge**:

      Plaintiff Angelo James Fricano brings this civil rights action against Defendants Lane County, Corizon Health, Inc., Sheriff Thomas M. Turner, and Jacob Pleich.  Mr. Fricano was arrested and booked at the Lane County jail on June 29, 2014.  In the days leading up to his arrest, and throughout his sixteen-day incarceration, Mr. Fricano suffered through a psychotic episode.  While at the jail, he was frequently observed by deputies and mental health staff, but was never medically screened, hospitalized, or otherwise provided meaningful ameliorative care for his psychosis.  He instead remained in segregation until being directly transported to a hospital upon his release from custody.  On June 29, 2016, Mr. Fricano filed suit pursuant to 42 U.S.C. § 1983, alleging that deputies, mental health staff, and the named municipal entities acted with deliberate indifference to his serious medical need.  Defendants now move for summary judgment as to all of Mr. Fricano's claims.  Because a reasonable jury could find that Mr. Pleich

and the municipal defendants were deliberately indifferent to Mr. Fricano's serious medical need, Defendants' joint motion for summary judgment is DENIED.

## BACKGROUND

Angelo James Fricano is an army veteran with no prior criminal record or documented history of mental illness.  *See* Brinson Decl., Ex. 10 at 34; Ex. 21 at 1.  He was arrested for the misdemeanor offense of menacing at the Oregon County Fair on June 29, 2014.  Brinson Decl. Ex. 37 at 1.  In the weeks leading up to his arrest, Mr. Fricano started to experience symptoms consistent with a psychotic break, possibly triggered by changes to medications he was prescribed for various physical ailments.  Brinson Decl., Ex. 10 at 4, 24-36; Ex. 20 at 4. According to family members, Mr. Fricano's mood became increasingly unstable and his behavior erratic. Brinson Decl., Ex. 10 at 24-36, 71.  This downward spiral culminated with Mr. Fricano's arrest at the County Fair following a threatening interaction with a vendor.  Brinson Decl., Ex. 37 at 1.

I.    Custody and Booking.

Mr. Fricano's arrest was witnessed by Lucy Kingsley, a Lane County Mental Health Director's Designee, who had followed deputies to the scene.  Brinson Decl., Ex. 9 at 5:20-7:3. After his arrest, Ms. Kingsley attempted to communicate with Mr. Fricano and assess his mental state.  Brinson Decl., Ex. 9 at 6:21-7:3.  She testified that Mr. Fricano was "significantly disturbed," unable to "communicate or [be] rational," and "psychotic, delusional, disoriented, [and] confused."  Brinson Decl., Ex. 9 at 10:25-11:3, 14:18, 16:22-23.  "I've been working in the field long enough," she added, "that I am usually able to find some way of making some kind of connection with someone regardless of how psychotic, delusional, disoriented, confused

somebody is, [but] . . . I was not able to make contact [with Mr. Fricano] at all in any way, shape, or form." Brinson Decl., Ex. 9 at 10:21-11:3.

As a result of Mr. Fricano's extreme condition, Ms. Kingsley faxed a Director's Hold to the jail noting that Mr. Fricano's prescription medications had recently been changed and stating that she had "probable cause to believe" that Mr. Fricano was "a mentally ill person who is dangerous to self or others and is in need of immediate care, custody, and treatment." Brinson Decl., Ex. 9 at 8:18-25; Ex. 10 at 6. The Hold was received by the jail, which contracts with Corizon Health, Inc. ("Corizon") to provide medical and psychiatric care, prior to Mr. Fricano being booked. Brinson Decl., Ex. 10 at 68. Although Ms. Kingsley wrongly believed that the Hold would require deputies or jail staff to transport Mr. Fricano to the hospital, she later spoke with Jacob Pleich, a Corizon Qualified Mental Health Professional ("QMHP") at the jail, and shared her belief that Mr. Fricano required emergency psychiatric care in a hospital setting. Brinson Decl., Ex. 9 at 8:23-25, 9:9-18; Ex. 19 at 56:14-57:13.

When Mr. Fricano arrived at Lane County Adult Corrections facility ("LCAC"), he was booked by Deputy J. Fifer. Brinson Decl., Ex. 15 at 2. Mr. Fricano resisted being removed from the patrol car and deputies eventually removed him by force. Brinson Decl., Ex. 11 at 2. According to Deputy Fifer, Mr. Fricano refused to "acknowledge" him and repeatedly stated "lawyer." Brinson Decl., Ex. 11 at 2. Deputy Fifer noted several obvious mental health problems, including "unusual behavior," an "agitated" state, and "showing signs of M/H issues." Brinson Decl., Ex. 16 at 1-3. Deputy Fifer was nevertheless able to take a mugshot of Mr. Fricano and complete a booking report, but, because he refused to answer questions and exhibited signs of mental illness, Mr. Fricano was not medically cleared into the jail. *See* Brinson Decl., Ex. 11 at 2; Ex. 16 at 1. He was instead directly transported to a segregation cell

and placed on suicide watch.  Brinson Decl., Ex. 11 at 2.  Deputy Fifer's booking report notes that he contacted Corizon mental health services, but it is unclear whether this was a referral or request for contemporaneous examination.  Brinson Decl., Ex. 16 at 3.  In either event, Corizon staff never medically cleared Mr. Fricano prior to his booking.

II.    Initial Visit and Assessments.

Once Mr. Fricano was placed in his cell, deputies repeatedly observed him exhibiting strange behavior.  *See* Brinson Decl., Ex. 11 at 1-7.  He stated that "he wanted the keeper of the key" and that, in the alternative, he would "take some drumsticks and fried chicken."  Brinson Decl., Ex. 11 at 2.  One deputy noted that he "keeps stating things that aren't making sense." Brinson Decl., Ex. 11 at 2.  Shortly after booking, Tawnya Hettwer, a Corizon QMHP, attempted to perform an initial mental health evaluation of Mr. Fricano through his cell door. Brinson Decl., Ex. 10 at 68.  Despite acknowledging on the assessment form that she had seen Ms. Kingsley's Hold, and instead of taking Mr. Fricano's disorientation and inability to answer questions as a sign of a serious mental health crisis, Ms. Hettwer decided not to complete the evaluation or take other action because Mr. Fricano was being uncooperative.  Brinson Decl., Ex. 10 at 68.  As a result, he remained on suicide watch (i.e., frequent observation by deputies). There was no mental health staff at the jail for the next twenty hours.  Brinson Decl., Ex. 17 at 1.

When Ms. Hettwer returned the following morning, she continued to assess Mr. Fricano. *See* Brinson Decl., Ex. 10 at 69-70.  She described Mr. Fricano's active mental health symptoms as "psychosis—delusional, paranoid" and noted that his judgment was "impaired" and that he was making "bizar (sic) comments to staff."  Brinson Decl., Ex. 10 at 69.  She then discharged Mr. Fricano from suicide watch based on her determination that he was "not a threat" and requested that another Corizon QMHP follow up with Mr. Fricano the next day.  Brinson Decl.,

Ex. 10 at 70. Despite learning about Mr. Fricano's recent change in prescription medications, she, nor any other official, ordered a physical examination. *See* Brinson Decl., Ex. 10 at 3. In the interim, Mr. Fricano remained in segregation and was described by deputies as "making psycho eyes," "very mentally ill," and "pounding on the door." Brinson Decl., Ex. 11 at 3-4. He also asked if one staffer was his father and, soon after, deputies took his silence as reason to withhold lunch. Brinson Decl., Ex. 10 at 67; Ex. 11 at 3. There is no record of Ms. Hettwer or any other person taking steps to ameliorate Mr. Fricano's extensively-documented symptoms of psychosis between June 29 and July 1.

III.  Visits by Mr. Pleich, Dr. Northway, and Dr. Richenstein.

The parties disagree precisely how many times Mr. Fricano interacted (i.e., engaged in verbal exchanges) with Corizon mental health staff between July 1 and 14. They agree, however, that Mr. Fricano did interact with two mental health professionals and that, over the course of his incarceration, he was "monitored" and "assessed" by various Corizon staff at least forty times. *See* Brinson Decl., Ex. 10 at 65-67. One of the mental health professionals with whom Mr. Fricano interacted after June 30 was Mr. Pleich, the Corizon QMHP who spoke with Ms. Kingsley about her Director's Hold. Brinson Decl., Ex. 3 at 78:22-79:7. It is undisputed that Mr. Pleich interacted with Mr. Fricano at least three times—most likely on July 1, 10, and 14. *See* Brinson Decl., Ex. 3 at 79:4-7; Ex. 10 at 24-25; Ex. 13 at 1; Talcott Decl., Ex. U at 5. There is also circumstantial evidence, based on Mr. Pleich's testimony and Corizon employment records, that Mr. Pleich interacted with Mr. Fricano on July 3 and 7, though Mr. Fricano denies that those interactions occurred and they were never documented. *See* Pleich Decl. ¶ 9; Brinson Decl., Ex. 17 at 3-4. As discussed below, the nature of those interactions is contested.

On July 1, Mr. Pleich visited Mr. Fricano for the first time. *See* Brinson Decl., Ex. 10 at 24-25. There is no record of the substance of that encounter beyond Mr. Fricano's recollection that it consisted of a basic mental status assessment and some observation. Brinson Decl., Ex. 3 at 79:4-12. After speaking with Mr. Fricano, Mr. Pleich contacted Susan Harrison, a social worker at the Roseburg Veteran's Administration Hospital ("VA"), to inquire about any existing diagnoses and changes in medication. Brinson Decl., Ex. 10 at 24-25. According to Ms. Harrison, Mr. Pleich described Mr. Fricano as "smashing his fist and head into the wall and the door, as well as "yelling and screaming intermittently." Brinson Decl., Ex. 10 at 24. She also noted that Mr. Pleich "expressed grave concerns about this veteran" and recalled him stating that Mr. Fricano had "decomp[ensated] pretty quickly." Brinson Decl., Ex. 10 at 24. At some point after this initial encounter and hearing from Ms. Kingsley, Mr. Pleich requested a referral to Victor Richenstein, M.D., the Corizon psychiatrist. Brinson Decl., Ex. 19 at 96:21-22.

Mr. Pleich testified that, as part of every encounter, he provided Mr. Fricano with "crisis intervention," "brief . . . counseling," and "suicide observation and prevention." Brinson Decl., Ex. 19 at 13:2-5. He further testified that, as with any prisoner, he would have documented every therapeutic intervention with Mr. Fricano, including any counseling. Brinson Decl., Ex. 19 at 66:2-3, 75:16-18, 100:2-3. The only other QMPH to interact with Mr. Fricano, Ms. Hettwer, also testified that any counseling or interventions would have been documented in Mr. Fricano's prison medical record. Ex. 39 at 19:24-20:5. The record, however, is devoid of any notes or materials describing ameliorative care offered to Mr. Fricano, including counseling. *See generally* Brinson Decl., Ex. 10. Corizon policy further dictates that QMHPs should develop a treatment plan and include it as part of a prisoner's medical record. *See* Brinson Decl., Ex. 33 at 13. In Mr. Fricano's LCAC medical record, however, there is no such plan; the form labeled

"Master Problem List" is also left blank and both Mr. Pleich and Ms. Hettwer testified that they never developed treatment plans for prisoners.  Brinson Decl., Ex. 10 at 1; Ex. 18 at 12:21; Ex. 19 at 67:20-22.  Mr. Pleich further testified that "there is no such thing as a treatment setting [at LCAC]."  Brinson Decl., Ex. 19 at 132:7-9

On July 2, deputies continued to note Mr. Fricano's deluded mental state.  Brinson Decl., Ex. 11 at 4-5.  As had occurred the day before, his inability to communicate was taken as a refusal of food at both lunch and dinner.  Brinson Decl., Ex. 11 at 4.  That same day, Mr. Fricano continued to make nonsensical remarks and twice attempted to run out of his segregation cell. Brinson Decl., Ex. 11 at 5.  In response to these outbursts, deputies used pepper spray and significant force to keep Mr. Fricano in his cell.  Brinson Decl., Ex. 11 at 4-5.  Despite this use of pepper spray, Mr. Fricano was not allowed to shower until July 4 and his daily break from confinement was revoked.  Brinson Decl., Ex. 11 at 4-7.  Although the observation log reflects that Mr. Fricano became less combative during his final four days at LCAC, the cycle of deluded behavior, resulting discipline, and perceived refusals of food continued throughout Mr. Fricano's incarceration.  *See* Brinson Decl., Ex. 11 at 1-7.

On July 3, 8, and 9, Mr. Fricano was evaluated by David Northway, Ph.D., as part of a Fitness to Proceed Evaluation ordered by defense counsel.  *See* Brinson Decl., Ex. 20 at 1-5. After observing Mr. Fricano's "bizarre," "unresponsive," "delusional," and "manic" behavior, Dr. Northway concluded that Mr. Fricano was psychotic, bipolar, and unfit to stand trial. Brinson Decl., Ex. 20 at 1, 3-5.  He further observed that Mr. Fricano "appears to be forming sentences that do not convey ideas or thoughts" and was "only marginally capable of normal communication."  Brinson Decl., Ex. 20 at 1.  Dr. Northway recommended "evaluations by an endocrinologist and other physical medicine providers in coordination and combination with a

Page 7 – OPINION AND ORDER

psychiatric provider." Brinson Decl., Ex. 20 at 4. With appropriate care, he noted, "it seems highly likely [Mr. Fricano] could be returned to fitness relatively quickly." Brinson Decl., Ex. 20 at 4. Dr. Northway was the only outside clinician to interact with Mr. Fricano.

After eleven days in custody and significant decompensation, Mr. Fricano was finally seen by Dr. Richenstein, the Corizon psychiatrist. Brinson Decl., Ex. 10 at 4. According to Dr. Richenstein, the encounter lasted "no more than fifteen minutes" and, as with all mental health encounters during Mr. Fricano's incarceration, was conducted through the "pie flap" on Mr. Fricano's cell door. Brinson Decl., Ex. 39 at 9:11-15. The encounter consisted of Dr. Richenstein assessing Mr. Fricano's condition and offering a delusional Mr. Fricano psychotropic medication, which he refused. Brinson Decl., Ex. 10 at 4; Ex. 39 at 8:22-9:2. Consistent with the descriptions of that encounter, Ms. Hettwer and Mr. Pleich testified that referral to the psychiatrist was virtually always for the purpose of prescribing psychotropic medications. Brinson Decl., Ex. 18 at 13:1-24; Ex. 19 at 23:1-5. He was not a resource for further intervention and, indeed, Dr. Richenstein testified that, despite being one of two individuals with the authority to do so, he had never transferred an LCAC inmate "to the emergency room . . . for acute mental health treatment." Brinson Decl., Ex. 39 at 16:9-12. The July 9 assessment was Mr. Fricano's only encounter with Dr. Richenstein.

IV.     Release and Treatment at Sacred Heart.

On July 14, after sixteen days in custody, Mr. Fricano was released from LCAC. Talcott Decl., Ex. I at 1-2. Prior to his release, however, Mr. Pleich completed a second Director's Hold, which, like the first one completed by Ms. Kingsley before Mr. Fricano arrived at the jail, stated that there was "probable cause to believe" that Mr. Fricano was "a mentally ill person who is dangerous to self or others and is in need of immediate care, custody, and treatment." Brinson

Page 8 – OPINION AND ORDER

Decl., Ex. 13 at 1. As a result of the Hold, Mr. Fricano was taken directly to the emergency department at Sacred Heart Medical Center ("Sacred Heart"). He was, at that time, admitted to the Johnson Unit and placed under an involuntary hold pursuant to Or. Rev. Stat. § 426.232. Brinson Decl., Ex. 29 at 12, 17. Mr. Fricano was medically "cleared," which included the first full physical examination he had received, and underwent a comprehensive psychiatric examination. Brinson Decl., Ex. 29 at 3-4, 98-100. Mr. Fricano was promptly diagnosed with "acute psychosis." Brinson Decl., Ex. 29 at 5.

While at Sacred Heart, staff created a treatment plan for Mr. Fricano. Brinson Decl., Ex. 39 at 34-40. That plan was updated daily. Brinson Decl., Ex. 39 at 34-40. He also received extensive individual and group therapy, counseling on coping strategies, therapeutic socialization, and other activities designed to restore his normal mental functioning. *See* Brinson Decl., Ex. 39 at 34-82, 93-100. Mr. Fricano was offered and consumed three meals each day and was provided with sleep aids. *See* Brinson Decl., Ex. 39 at 43-82. The care at Sacred Heart paid immediate dividends. On July 17, after just three days at Sacred Heart, Mr. Fricano was described as "clear, coherent, and goal directed." Brinson Decl., Ex. 39 at 97. He was discharged from the Johnson Unit and voluntarily transferred to the Roseburg V.A. Brinson Decl., Ex. 39 at 97. Once at the V.A., Mr. Fricano declined further treatment and, because he was no longer deemed a threat to himself or others, was allowed to go home. Talcott Decl., Ex. Q at 4-5. In October 2014, Mr. Fricano began receiving treatment from a clinical psychologist, Dennis Viene, Ph.D., who diagnosed him with Post-Traumatic Stress Disorder ("PTSD") and depression. Brinson Decl., Ex. 45 at 1-4. He continued to receive treatment from Dr. Viene through at least October 31, 2017. Brinson Decl., Ex. 45 at 95.

On June 29, 2016, Mr. Fricano filed the instant civil rights action, alleging that Lane County deputies, Corizon mental health staff, and the named municipal entities acted with deliberate indifference to his serious medical need. Mr. Fricano has since elected to dismiss five of the individually named defendants, leaving Mr. Pleich as the only defendant sued in his individual capacity.[1] He is joined by Sheriff Turner, in his official capacity, Corizon, and Lane County (collectively the "municipal entities"). On January 1, 2018, Corizon and Mr. Pleich moved for summary judgment as to all of Mr. Fricano's claims. Sheriff Turner and Lane County joined in that motion shortly thereafter. The matter is now before this Court. For the reasons stated below, Defendants' joint motion for summary judgment is DENIED.

## STANDARD

The Court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it could affect the outcome of the case and an issue is "genuine" if a reasonable jury could find in favor of the non-moving party. *Rivera v. Phillip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005) (citation omitted). When ruling on a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). If the movant carries its burden, then the non-movant must present "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (quoting Fed. R. Civ. P. 56(e)). The "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient" to avoid summary judgment. *Liberty Lobby, Inc.*, 477 U.S. at 255.

---

[1] Mr. Fricano also named Sheriff Turner in his personal capacity, but has represented to Defendants, and to the Court at oral argument on June 4, 2018, that he will withdraw his personal-capacity claim against Sheriff Turner.

**DISCUSSION**

The present dispute arises under 42 U.S.C. § 1983. Section 1983 allows an individual to bring suit against a municipality and its officials for depriving her of a constitutional right. *Monell v. Dep't of Social Servs. of the City of New York*, 436 U.S. 658, 690-91 (1978). To prevail in such an action, a plaintiff must show that the defendant both (1) acted "under color of state law" and (2) deprived her of a "right secured by the Constitution or laws of the United States." *Long v. Cty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006). The parties here do not dispute, and the Court assumes, that the alleged conduct of each defendant occurred under color of state law. It is also undisputed that Plaintiff's claims, as those of a pretrial detainee, are properly analyzed under the Due Process Clause of the Fourteenth Amendment. *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998). The tests for individual and municipal liability differ and are therefore addressed separately. Because a reasonable jury could find that Mr. Pleich and the Municipal Entities deprived Mr. Fricano of his Fourteenth Amendment right to due process, Defendants' joint motion for summary judgment is DENIED.

I.  Personal Liability of Jacob Pleich.

Mr. Fricano alleges that Mr. Pleich was deliberately indifferent to his serious medical need. To prevail on a claim of deliberate indifference against an official sued in her personal capacity, a plaintiff must demonstrate that (1) she had a serious medical need, (2) the official was deliberately indifferent to that need, and (3) this indifference caused her harm. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). A serious medical need is one which, without treatment, "could result in further significant injury or the unnecessary and wanton infliction of pain." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1991) (internal quotation marks and citation omitted). Defendants concede that Mr. Fricano experienced a serious medical need, but contest

whether Mr. Pleich was deliberately indifferent to that need and, if so, whether his indifference caused Mr. Fricano any harm. Because there are genuine disputes of fact such that a reasonable jury could conclude both that Mr. Pleich was deliberately indifferent and that his indifference harmed Mr. Fricano, summary judgment is denied as to Mr. Pleich.

**A. Deliberate Indifference**.

An official is deliberately indifferent to a detainee's serious medical need if she fails to take "reasonable available measures" in reckless disregard of a "substantial risk of serious harm" to the detainee. *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018). This is an objective deliberate indifference standard, requiring not only that an official's conduct be unreasonable, but also that the "high degree of risk" from that conduct be obvious. *Id.* As the Supreme Court has made clear, mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's rights. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Instead, a plaintiff must show that the denial, delay, or otherwise unreasonable course of medical care was taken in "reckless disregard" of an excessive risk to the plaintiff's health or safety. *Gordon*, 888 F.3d at 1125; *see also Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996). Whether an official knew or should have known of a substantial risk of serious harm is a "question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Conn v. City of Reno*, 591 F.3d 1091, 1097 (9th Cir. 2010).

Mr. Pleich argues that Mr. Fricano is simply unhappy with the treatment he received and that, even if that treatment was unreasonable, he cannot show that it was administered in conscious disregard of an excessive risk to his health.[2] As an initial matter, the parties disagree

---

[2] Since Mr. Pleich submitted his motion, the deliberate indifference standard has changed from a subjective one to an objective one. *Compare Gordon*, 888 F.3d at 1125 *with Clouthier v. Cty. of Contra Cosa*, 591 F.3d 1232, 1242-43 (9th Cir. 2010). In turn, Mr. Pleich's argument with respect to whether he *consciously*, rather than recklessly,

as to whether Mr. Fricano, in fact, received any "treatment" while incarcerated. To the extent

Mr. Pleich believes that the distinction is significant—since an affirmative course of treatment

must have been *medically* unreasonable—the care received and the nature of that care are

disputes of fact which must be resolved in favor of the non-movant. In support of his position,

Mr. Fricano cites to the absence of any description of ameliorative care in his prison medical

record, *see* Brinson Decl., Ex. 10 at 1-6, 65-71, testimony by multiple Corizon officials that all

such therapeutic interventions were normally documented, Ex. 19 at 66:2-3, 75:16-18, 100:2-3;

Ex. 39 at 19:24-20:5, and Mr. Pleich's own testimony that there is "no . . . treatment setting" at

LCAC, Ex. 19 at 132:7-9. Mr. Fricano's position is further supported by the expert report of

Mark Diamond, O.D.,[3] which states that Defendants "fail[ed] to treat [Mr. Fricano's] mental

health conditions," Talcott Decl., Ex. E at 12, and the care he later received at Sacred Heart,

---

disregarded an excessive risk to Mr. Fricano's health, although relevant at the time, is now moot. Since the Court would find that granting summary judgment for Mr. Pleich is inappropriate under either deliberate indifference standard, and the subjective standard is more onerous than the objective standard, the Court is comfortable relying on the parties' remarks at oral argument and does not feel the need for additional briefing.

[3] Defendants move to strike the expert testimony and report of Dr. Diamond on the grounds that it contains impermissible legal conclusions and is based on an unreliable methodology. Under Fed. R. Civ. P. 56(c)(2), evidence relied upon at summary judgment must be capable of being put "in a form that would be admissible as evidence." The Court agrees that portions of Dr. Diamond's report state legal conclusions and must be stricken. To the extent Dr. Diamond opines that Mr. Fricano had his civil rights violated and that Defendants were "deliberately indifferent," the Court disregards those conclusions.

For the purposes of summary judgment, however, the Court disagrees that Dr. Diamond's other findings are based on an unreliable methodology or application of that methodology. Dr. Diamond clearly outlines the information he relies upon in reaching his conclusions and makes his diagnosis pursuant to the Diagnostic and Statistical Manual of Mental Disorders ("DSM"). Defendants are entitled not to agree with the conclusions reached by Dr. Diamond, and their observations about the internal inconsistencies of the report may be relevant to its weight, but Defendants have presented no evidence or precedent suggesting that the failure to walk through each DSM factor renders an expert opinion unreliable.

Defendants also argue that Dr. Diamond did not take notes of his interview with Mr. Fricano and that this, too, renders his report unreliable. That argument is moot because Mr. Fricano turned over Dr. Diamond's notes after Defendants filed their motion. The Court acknowledges that Mr. Fricano's production of the notes was after the discovery deadline and despite a prior request for production. Under the circumstances, however, the tardy production is not reason to strike Dr. Diamond's report or exclude his testimony. The notes merely repeat what is contained in the descriptive portions of Dr. Diamond's report and, as such, Defendants have suffered no prejudice from the omission. There is also no evidence that the omission was in bad faith.

*compare* Brinson Decl., Ex. 10 at 1-6, 65-71 (reflecting exclusive reliance on observation and assessment through the door of Mr. Fricano's cell) *with* Brinson Decl., Ex. 29 (reflecting formal diagnosis, physical examination, detailed and dynamic treatment plan, individual therapy sessions, group therapy sessions, and therapeutic socialization). This is evidence from which a jury could find that Mr. Fricano was never treated or that any treatment was "so cursory as to amount to no treatment at all."[4] *Tolbert v. Eyman*, 434 F.2d 625 (9th Cir. 1970).

The controlling question therefore remains whether Mr. Pleich took objectively reasonable steps to address Mr. Fricano's serious medical need. It may be that monitoring, rather than intervening, was reasonable under the circumstances. Indeed, Mr. Fricano concedes that he was observed or assessed by staff forty times, including at least three times by Mr. Pleich. *See* Brinson Decl., Ex. 10; Talcott Decl., Ex. U. That fact notwithstanding, Mr. Fricano arrived and departed from LCAC in the same acutely psychotic state, despite evidence that his condition could have been, and indeed was, quickly improved with basic therapeutic interventions. *See* Talcott Decl., Ex. Y at 4 ("[Mr. Fricano] could be returned to fitness relatively quickly in the appropriate setting . . . ."); Brinson Decl., Ex. 29 (evidencing rapid improvement at Sacred Heart). On that basis alone, a jury could reasonably infer that the care Mr. Fricano received was deficient. Moreover, as a matter of common sense, a jury could find that an inmate described as "smashing . . . his head into the wall," Brinson Decl., Ex. 10 at 63, "very mentally ill," Ex. 15 at

---

[4] As further evidence that he was never treated, and that Mr. Pleich failed to take reasonable available measures, Mr. Fricano notes that Mr. Pleich never referred him for a physical examination. Defendants assert that because Mr. Fricano was suffering from a psychiatric ailment, and not a physical ailment, the lack of a physical examination is inapposite to the question of whether he received treatment. It is true that Mr. Fricano's serious medical need was his psychosis, but there is evidence that his psychosis was triggered by a change in prescription medications for two physical ailments. Mr. Pleich—based on his conversation with Ms. Harrison at the V.A., Ms. Hettwer's notes in Mr. Fricano's prison medical record, and conversations with Mr. Fricano's mother—knew that Mr. Fricano had recently changed medications and that the change coincided with his pre-arrest decompensation. A jury could reasonably find that the failure to address or even investigate the likely (physiological) cause of his psychosis is further evidence that Mr. Fricano received no treatment and that Mr. Pleich failed to take reasonable available measures.

Page 14 – OPINION AND ORDER

6, "delusional," Ex. 10 at 69, having "psycho eyes," Ex. 15 at 6, and "incoherent," Talcott Decl., Ex. Y at 1, required more than observation, assessment, and, at best, triage counseling.[5] The report of Dr. Diamond, and the Fitness to Proceed Evaluation of David Northway, Ph.D.,[6] both of which support the inference that care was medically unreasonable, further bolster that conclusion.[7] *See, e.g.*, Talcott Decl., Ex. E at 11-12; Ex. Y at 4.

---

[5] The Court recognizes that Mr. Pleich likely lacked the authority to unilaterally authorize an inmate's transfer to the hospital, *see* Brinson Decl., Ex. 141:5-145:16, but that did not absolve him of the duty to take other reasonable steps, such as administering additional treatment in the prison setting, referring Mr. Fricano for a physical examination, or, more importantly, alerting a supervisor with transfer authority. As Defendants acknowledge, a prisoner experiencing an "acute" mental health crisis should be transferred to a hospital. *See, e.g.*, Shelton Decl. ¶ 9. Mr. Fricano was promptly diagnosed with "acute psychosis" upon his arrival at LCAC, Brinson Decl., Ex. 29 at 5, and, as discussed *infra*, Mr. Pleich appreciated the seriousness of Mr. Fricano's condition and the need for additional treatment. He had, moreover, recommended transfers in the past, suggesting that a procedure for such recommendations existed. Brinson Decl., Ex. 19 at 141:19-21. As such, given the evidence in the record, whether Mr. Pleich's conduct was reasonable is a question of fact for the jury.

[6] Defendants move to strike the Fitness to Proceed Evaluation of Dr. Northway on the grounds that he was not disclosed as an expert witness and that his evaluation constitutes inadmissible hearsay.

Under Fed. R. Civ. P. 26(a)(2), a party must "disclose the identity of any witness it may use at trial" to present expert testimony. That rule, however, is subject to the exception that a treating physician need "not be disclosed as an expert witness so long as the physician's testimony is limited to opinions formed during the course of treatment." *Poyer v. United States*, No. 6:11-CV-03040-AA, 2013 WL 4786485, at *3 n.3 (D. Or. Sept. 3, 2013); *see also Goodman v. Staples the Office Superstore*, LLC, 644 F.3d 817, 826 (9th Cir. 2011) ("[T]reating physicians are usually exempt from Rule 26(a)(2)'s requirements . . . ."). Although Dr. Northway is not, strictly speaking, a treating physician, the rationale which permits treating physicians to testify without disclosure applies to him with equal force. Dr. Northway's evaluation is limited to "what he saw and did" and provides a snapshot of Mr. Fricano's medical condition—it does no more than reflect an opinion "formed in the course of caring for," or otherwise medically evaluating, Mr. Fricano. *Goodman*, 644 F.3d at 819-20.

Even if Mr. Fricano was required to disclose Dr. Northway as an expert witness, the Court would allow his evaluation into the record because Mr. Fricano produced the evaluation as part of fact discovery—making the lack of disclosure harmless—and there is no evidence that counsel for Mr. Fricano acted in bad faith. *See* Fed. R. Civ. P. 37(c)(1). The Court also finds that the evaluation qualifies, at the very least, as a record of a regularly conducted activity, Fed. R. Evid. 803(6), and a statement made for medical diagnosis, Fed. R. Evid. 803(5), taking it outside of the rule against hearsay.

[7] At oral argument, Defendants implied that Mr. Fricano fails to offer any admissible expert testimony on the issue of whether he received adequate psychiatric care and that deliberate indifference cannot be shown without such testimony. As to the first proposition, Mr. Fricano does offer admissible expert evidence, albeit currently in a form which may not carry great weight with a jury. As to the second proposition, even if that evidence were inadmissible, expert testimony is not, as a matter of law, required to prove a claim of deliberate indifference. *See Hathaway v. Coughlin*, 37 F.3d 63, 68 (2d Cir. 1994) ("We have never required plaintiffs alleging a denial of adequate medical care in a Section 1983 action to produce expert medical testimony."); *Krause v. Whitley*, No. 91-16718, 1993 WL 22381, at *3 (9th Cir. 1985) ("The issue of deliberate indifference to the serious medical needs of a prisoner is not so complicated and difficult that an expert is required to present or prove the case.").

Since a trier of fact could find that Mr. Pleich failed to take reasonable ameliorative steps, the next issue is whether that failure was in the face of a known or obvious substantial risk of serious harm to Mr. Fricano. There is ample evidence from which a jury could find that Mr. Pleich should have known, and likely knew, that Mr. Fricano required care beyond that which Mr. Pleich offered and, more generally, that which was available at LCAC. To begin, Mr. Pleich's own description of Mr. Fricano's condition, as well as his acknowledged review of the same by other staff, suggests that he was aware of its serious nature. Shortly after first observing Mr. Fricano, for example, he stated that Mr. Fricano "had decomp[ensated] pretty quickly" and was "smashing his fist and head into the wall and the door." Brinson Decl., Ex. 10 at 63. A social worker at the Roseburg V.A. who spoke with Mr. Pleich that same day also described him as having expressed "grave concerns" about the wellbeing of Mr. Fricano. Brinson Decl., Ex. 10 at 63. Mr. Pleich's colleagues noted similar concerns and recorded equally alarming descriptions in Mr. Fricano's inmate and medical logs, *see, e.g.*, Brinson Decl., Ex. 10 at 67-69; Ex. 15 at 5-6, both of which Mr. Pleich acknowledges reviewing daily, Ex. 19 at 77:6-16, 53:19-54:1.

More importantly, Mr. Pleich's own description of the psychiatric care available at LCAC, as well as the two Director's Holds placed on Mr. Fricano, support the inference that Mr. Pleich should have known, and likely did know, of Mr. Fricano's need for additional treatment. In his deposition, for instance, Mr. Pleich testified that anyone familiar with the jail would understand that "there is no such thing as a treatment setting" at LCAC. Brinson Decl., Ex. 19 at 98:4-9. He further testified that he and other mental health staff never created treatment plans for prisoners, Brinson Decl., Ex. 19 at 67:20-22, and that they could only offer prisoners "crisis intervention," "brief . . . counseling," and "suicide observation and prevention," Ex. 19 at 22:18-22. Although mental health staff could refer patients to a contract psychiatrist, Mr. Pleich knew

Page 16 – OPINION AND ORDER

that the psychiatrist had extremely limited hours, Brinson Decl., Ex. 19 at 70:13-72:15, believed that there was not "an adequate amount of psychiatric coverage at [LCAC]," Ex. 30 at 5, and, in the case of Mr. Fricano, that he was only seen on his eleventh day in custody, Ex. 10 at 4. A reasonable jury could infer that Mr. Pleich's understanding of Mr. Fricano's serious medical need, combined with his statements regarding the care available at LCAC and his failure to take additional ameliorative steps, made the risk to Mr. Fricano's health and safety obvious.

This inference is further supported by the fact that Mr. Fricano arrived at LCAC with a Director's Hold and had a second one placed on him by Mr. Pleich just before his release. A Director's Hold is a one-page directive stating that there is "probable cause to believe" that a named individual "is a mentally ill person, who is dangerous to self or others, and is in need of immediate care, custody, and treatment." Brinson Decl., Ex. 10 at 6. It further directs the recipient to take the named person "into your custody and immediately remove said person" to a specified medical facility. Brinson Decl., Ex. 10 at 6. Although the parties disagree as to the legal effect of a Director's Hold, it is undisputed that Lucy Kingsley, author of the first hold, believed, and shared with Mr. Pleich, that Mr. Fricano required immediate hospitalization and that filing a hold would result in the same. Brinson Decl., Ex. 9 at 11:4-11 ("I hoped that [by faxing the Hold] he would be sent to the emergency room at Sacred Heart for further evaluation."); Ex. 19 at 56:14-57:16 ("I called Ms. Kingsley and . . . know that she was confused about the effectiveness of a director's hold once somebody came into custody."). It is also undisputed that Mr. Pleich used his own Director's Hold to mandate that Mr. Fricano be taken directly to Sacred Heart upon his release from LCAC. When viewed together, the holds permit the inference that Mr. Pleich knew of Ms. Kingsley's concerns and intent when Mr. Fricano

arrived at LCAC, believed that Mr. Fricano's health and safety were still at risk when he was released, and yet disregarded those same risks by doing little in the interim.

### B. Causation.

Lastly, an official's deliberate indifference must also harm the prisoner. *Jett*, 439 F.3d at 1096. Here, there is evidence from which a reasonable jury could find that, because of Mr. Pleich's failure to take reasonable ameliorative steps, Mr. Fricano suffered through an unnecessarily long period of psychosis and developed Post-Traumatic Stress Disorder ("PTSD"). Dr. Northway's Fitness to Proceed Evaluation, *see* Brinson Decl., Ex. 20 at 4, and Mr. Fricano's rapid improvement at Sacred Heart, *compare* Ex. 29 at 17 (diagnosing Mr. Fricano with "acute psychosis") *with* Ex. 29 at 43-46 (deeming Mr. Fricano fit for release), suggest that further treatment would have resulted in a shorter or less intense period of psychosis. In addition, the treatment records of Dennis Viene, Ph.D.,[8] *see* Brinson Decl., Ex. 45 (diagnosing and describing PTSD), and the report of Dr. Diamond, Talcott Decl., Ex. F at 12 (finding that "many of [Mr. Fricano's] PTSD symptoms . . . are directly related to" his time at LCAC), both support that the failure to treat Mr. Fricano prolonged his psychosis and caused him to develop PTSD. Taken together, a reasonable jury could find that Mr. Pleich's deliberate indifference to Mr. Fricano's serious medical need caused Mr. Fricano to suffer "unnecessary and wanton" pain.

---

[8] Defendants move to strike the testimony and treatment records of Dr. Viene on the grounds that he was not disclosed as an expert witness, his evaluation constitutes inadmissible hearsay, and his conclusions are not medically reliable. Dr. Viene is Mr. Fricano's treating psychologist and therefore covered by the expert disclosure and hearsay exceptions discussed in footnote 6. Further, Defendants' argument that Dr. Viene's diagnoses are unreliable because they rely on Mr. Fricano's own account of his experience while in custody is baseless. As Mr. Fricano rightly points out, ascertaining a patient's psychological state necessarily requires self-reporting from the patient. It would be an absurd state of affairs if treating psychologists were required to both treat and thoroughly investigate the accounts offered by their patients. For that reason, there is a "presumption of reliability of statements which flow from 'the patient's strong motivation to be truthful' when seeking diagnosis and treatment. *United States v. Nez*, 659 Fed. Appx. 376, 379 (9th Cir. 2016) (quoting *Guam v. Ignacio*, 10 F.3d 608, 612 (9th Cir. 1993)).

II. *Monell* Liability of Corizon Health, Lane County, and Sheriff Turner.

Mr. Fricano also alleges that Corizon Health and Lane County, through Sheriff Turner, were deliberately indifferent to his serious medical need.[9]  A municipal entity is not responsible for the acts of its employees under a *respondeat superior* theory of liability.  *City of Canton v. Harris*, 489 U.S. 378, 386 (1989).  Instead, "it is only when the execution of the government's policy or custom inflicts the injury that the municipality may be liable under § 1983."  *Id.*  To prevail on a claim of deliberate indifference against a municipal entity, a plaintiff must show that (1) she was deprived of a constitutional right, (2) the entity had a policy or custom evincing its deliberate indifference to the prisoner's constitutional right, and (3) the policy or custom was the moving force behind the constitutional violation.[10]  *Burke v. Cty. of Alameda*, 586 F.3d 725, 734 (9th Cir. 2009).  Because there are genuine disputes of fact such that a reasonable jury could find that the policies or customs of Corizon and Lane County amounted to deliberate indifference and were the moving forces behind deprivations of Mr. Fricano's right to due process, summary judgment is denied as to the municipal defendants.

**A. Deprivation of a Constitutional Right**.

As discussed in Part I, a reasonable jury could find that Mr. Pleich was deliberately indifferent to Mr. Fricano's serious medical need and therefore deprived Mr. Fricano of his Fourteenth Amendment right to due process.  On that basis alone, Mr. Fricano may be able to

---

[9] As noted above, the parties do not dispute that, for the purposes of Section 1983, all three municipal entities acted under color of state law and are susceptible to *Monell* claims.  *See Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1138-39 (9th Cir. 2012) (discussing contract services specifically).

[10] Although there have traditionally been two different paths to municipal liability in the Ninth Circuit—one premised on policies of "action" and the other on policies of "inaction"—that distinction appears to be immaterial in the wake of *Gordon*. Under *Gibson*, liability premised on a policy of action requires that the municipal entity acted "with the state of mind required to prove the underlying violation" (i.e., personal liability), whereas liability premised on a policy of inaction is based on an objective standard of deliberate indifference (i.e., recklessness). *Gibson*, 290 F.3d at 1185.  Since, following *Gordon*, individual liability is also now analyzed under an objective standard, the Court sees no material difference between the two paths to municipal liability—both require deprivation of a constitutional right, a causal link between that deprivation and municipal policy, and recklessness.

hold Corizon and Lane County liable for his injuries if their policies or customs were the moving force behind this deprivation and reflect their own deliberate indifference. The isolated conduct of Mr. Pleich, however, is not Mr. Fricano's only path to demonstrating municipal liability. *See Gibson*, 290 F.3d at 1186 n.7. This proposition has been "rejected as an inflexible requirement by both [the Ninth Circuit] and the Supreme Court." *Id.* To the contrary, a jury may find that, even if Mr. Pleich is not personally liable, the combined acts or omissions of other officials operating under a municipal policy or custom, or an affirmative policy or custom which is constitutionally suspect on its face, created a "substantial risk of serious harm" to Mr. Fricano and was employed despite the risk of such harm being "obvious." *Id.* at 1188-90; *see also Speer v. Glover*, 276 F.3d 980, 986 (8th Cir. 2002); *Garcia v. Salt Lake Cty.*, 768 F. 2d 303, 310 (10th Cir. 1985); *Anderson v. City of Atlanta*, 778 F.2d 678, 686 (11th Cir. 1985).

As relevant here, a substantial risk of serious harm, and therefore a potential deprivation of due process, may exist if a municipal entity fails to timely screen incoming detainees for acute mental health conditions, *see, e.g.*, *Gibson*, 290 F.3d at 1189, provide ameliorative medical care beyond regular monitoring and assessment, *see, e.g.*, *Lavender v. Lampert*, 242 F. Supp. 2d 821, 843 (D. Or. 2002), transfer detainees if it cannot provide adequate treatment, *see, e.g.*, *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982), or appropriately house inmates with mental health conditions, *see, e.g.*, *Coleman v. Brown*, 28 F. Supp. 3d 1068, 1265-66 (E.D. Cal. 2014). As such, if there is evidence from which a reasonable jury could find that Corizon or Lane County had a practice of failing to direct constitutionally mandated actions, or otherwise directed their officials to engage in unconstitutional practices, then they may still be liable to Mr. Fricano, even absent a finding that any individual official is liable.

### B. Policies and Customs.

The next question, then, is whether Corizon and Lane County had policies or customs which either created a substantial risk of serious harm to Mr. Fricano and/or were implicated in the wrongful conduct of Mr. Pleich.  An "official municipal policy includes the decisions of a government's lawmakers [and] the acts of its policymaking officials."  *Connick v. Thompson*, 563 U.S. 51, 61 (2011).  A plaintiff may also establish municipal liability by showing that the municipal entity had a permanent and well-settled practice, or "custom," which gave rise to the constitutional violation.  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).  Although "one or two incidents" cannot constitute a custom, "there is no case law that a custom cannot be inferred from behavior toward a single individual."  *Oyenik v. Corizon Health, Inc.*, 696 Fed. Appx. 792, 794 (9th Cir. 2017) (citation omitted); *see also Navarro v. Block*, 72 F.3d 712, 714-15 (9th Cir. 1995) ("Once such a showing is made, a municipality may be liable for its custom irrespective of whether official policy-makers had actual knowledge of the practice at issue.").  Whether a policy or custom exists, as well as whether it created a substantial risk of serious harm, is generally a question of fact for the jury.  *Gibson*, 290 F.3d at 1195.

Mr. Fricano alleges an extensive and fragmented list of deficient policies and customs on the part of Corizon.  In the interest of efficiency and clarity, the Court divides Mr. Fricano's allegations against Corizon into three categories.  The first category relates to Corizon's medical clearance of incoming detainees.  Specifically, Mr. Fricano alleges that Corizon had a custom of failing to complete intake medical screenings for inmates with mental health issues prior to their being booked at LCAC.  Corizon was contractually responsible for screening and medically clearing any incoming individual with "a questionable or unstable medical condition . . . prior to booking," Brinson Decl., Ex. 7 at 24, 79; Ex. 31 at 1, and its own written policies required

"evaluation by a physician *prior* to . . . acceptance into [LCAC]" if an individual displayed "altered mental status of unknown etiology," Ex. 12 at 1 (emphasis in original), but there is no evidence that Mr. Fricano was screened by any medical professional prior to being admitted to LCAC. Although a Corizon official later attempted to assess Mr. Fricano's mental health status, *see* Brinson Decl. Ex. 10 at 68, this was only after he had been admitted and placed in segregation, not as part of the pre-booking process described in Corizon's policies.

This lack of pre-booking medical clearance for Mr. Fricano is consistent with deposition testimony by Mr. Pleich that Corizon "never" screens incoming detainees for emergent mental health conditions. Brinson Decl., Ex. 30 at 7. That testimony, which was delivered in January 2014 and covered a period reaching back to January 2013, is evidence from which a jury could find that Corizon had a settled practice of failing to conduct pre-booking medical clearance for individuals with even the most acute mental health issues. *See also* Brinson Decl., Ex. 19 at 37:2-17 (extending that observation, in later deposition, through July 2014). A jury could also reasonably find that this custom created a substantial risk of serious harm to Mr. Fricano. Corizon's own written policies emphasize that intake medical screening is "an important inquiry" and "fundamentally one of the most important functions that the medical services team will provide." Brinson Decl., Ex. 7 at 79. To that end, as a matter of common sense, the failure to screen for an entire category of serious medical need (i.e., mental health crises)—a category which may require outside treatment prior to jail admission—could be viewed as creating a substantial risk of serious harm. *Cf. Gibson*, 290 F.3d at 1189.

The second category of customs alleged by Mr. Fricano relates to the care administered once he was admitted to LCAC. He specifically argues that Corizon had a custom of failing to provide ameliorative mental health care and, relatedly, adequate psychiatric staffing and

supervision. With respect to the adequacy of care, the record is replete with evidence that Mr. Fricano never received ameliorative care at LCAC. As discussed in Part I, a jury could find that observation and assessment, without more, do not constitute treatment for purposes of the Due Process Clause. Indeed, Corizon's own policies state that mental health services should, "*at a minimum*," include "individual counseling [and] group counseling," Brinson Decl., Ex. 61 at 1 (emphasis added), as well as an actual "treatment plan," Ex. 33 at 13. Notably, Corizon's policies and contract treat these services—none of which Mr. Fricano received—as distinct from observation and assessment. Brinson Decl., Ex. 7 at 22; Ex. 49 at 17. Ms. Hettwer, the only other QMHP to interact with Mr. Fricano, stated that officials never created "treatment plans," noted that prisoners were offered virtually no "treatment" beyond referral for medication, and described her job as "[p]reventing the jail from being sued."[11] Brinson Decl., Ex. 18 at 12:21, 21:7-10. A jury could, based on this testimony and Mr. Fricano's experience, conclude that Corizon had a custom of failing to adequately treat prisoners experiencing mental health crises.

As further evidence of these shortcomings, Mr. Fricano argues that Corizon also had a custom of inadequately staffing and supervising its mental health team at LCAC. In Mr. Fricano's case, it is uncontested that it was not until Mr. Fricano's eleventh day in custody that Dr. Richenstein spoke to him through the "pie flap" on his cell door. This encounter, according to Dr. Richenstein, lasted "no more than 15 minutes" and consisted solely of offering a delusional Mr. Fricano psychotropic medication. Brinson Decl., Ex. 39 at 9. This limited

---

[11] To the extent Defendants argue that these referrals preclude a finding that they customarily denied treatment for mental health crises, that argument is "wholly underwhelming." *Kemp v. City of Springfield*, No. 10-cv-6420-TC, at *19 (D. Or. June 14, 2013). In the case of Mr. Fricano, it was not until his eleventh day in custody that, through the "pie flap" on his cell door, he was visited by Dr. Richenstein. The one-time refusal of medication by a patient like Mr. Fricano, who lacked virtually any sense of person, place, and time, does not absolve Corizon of its responsibility to either provide other ameliorative care or transfer Mr. Fricano to a setting where such care could be provided. A jury could find that, notwithstanding the practice of belatedly offering delusional, psychotic prisoners psychotropic medication, Corizon had a custom of failing to treat prisoners experiencing acute mental health crises.

availability of Dr. Richenstein was not an aberration. Corizon records show that, although he was contracted to be at LCAC for a total of sixty-four hours between June 29 and July 26, 2014, Dr. Richenstein fell short of that requirement by over thirty-six hours. Brinson Decl., Ex. 57 at 1. In fact, between November 2013 and July 2014, Dr. Richenstein regularly failed to meet this monthly quota, often by more than twenty hours. Brinson Decl., Ex. 57 at 1-13. There is also evidence that Corizon lacked an onsite clinical supervisor for QMHPs, Brinson Decl., Ex. 19 at 148:10-17, and that the HSA split time between LCAC and a facility in Florida, Ex. 49:21-50:3. A reasonable jury could find that, based on the paltry hours worked by Dr. Richenstein and the absence of an onsite clinical supervisor, Corizon had a custom of inadequately staffing and supervising its mental health division and that, along with the lack of ameliorative care offered by available staff, this created a substantial risk of serious harm.

The third category of customs alleged by Mr. Fricano relates to the medical transfer of detainees. He argues that, contrary to Corizon's written policies and contract with Lane County, detainees requiring "acute mental health services beyond those available at [LCAC]" were never "transferred to an appropriate treatment facility." Brinson Decl., Ex. 59 at 2. Although transfer reasonably required a sufficiently acute mental health crisis and a finding that outside care was warranted, the Court's earlier discussion already concluded that Mr. Fricano had a serious medical need and that a jury could find that Corizon's screening, treatment, and staffing procedures were inadequate to meet Mr. Fricano's need. It is a small inferential step for a trier of fact to also find, based on the dozens of times Mr. Fricano was observed in a psychotic state, that Corizon had a custom of not transferring detainees requiring outside psychiatric services. That conclusion is further supported by the testimony of Dr. Richenstein, who stated that Corizon "never transferred anybody to the emergency room for . . . acute mental health treatment."

Brinson Decl., Ex. 39 at 16:9-12. Indeed, the psychiatrist and HSA, both of whom were apparently absent from LCAC premises on a regular basis, are the only ones with direct authority to authorize a medical transfer out of the jail. There is therefore evidence that Corizon had a custom of failing to transfer detainees with acute mental health crises and that this failure created a substantial risk of serious harm. *Cf. Hoptowit*, 682 F.2d at 1253.

Lastly, Mr. Fricano also alleges that Lane County had its own policy of ratifying the unconstitutional practices of Corizon. To be liable, Lane County must have made a "deliberate choice among various alternatives to follow a particular course of action." *Gillette v. Delmore*, 979 F.2d 1342, 1348 (9th Cir. 1992). A municipal entity makes such a deliberate choice if one of its policymakers acquiesces in a "custom of which the supervisor must have been aware." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988). Although Corizon was responsible for medical care at LCAC, a reasonable jury could find that Lane County, through Sheriff Turner, was actually or constructively aware of Corizon's custom of failing to medically clear detainees with mental health issues, inadequately staffing and supervising its mental health team, and failing to transfer detainees suffering acute mental health crises. Specifically, Lane County held monthly meetings with Corizon officials at which the screening and staffing issues were repeatedly discussed and, because medical transfer required approval from LCAC, it would be reasonable to infer that they knew, or should have known, that such transfers never occurred. Since there is no evidence that Sheriff Turner ever penalized or enforced the terms of Corizon's contract, it would be reasonable to find that Lane County ratified Corizon's deficient practices.

### C. Deliberate Indifference.

Municipal liability hinges not only on the existence of practices posing a substantial risk of serious harm, but also on whether the municipal entity knew or should have known that these

Page 25 – OPINION AND ORDER

practices were likely to create such a risk or lead to violations by employees. *Gibson*, 290 F.3d at 1190; *see also Gordon*, 888 F.3d at 1125. Here, Corizon's customs of failing to screen, treat, and transfer acutely ill detainees were all contrary to its own written policies and contract with Lane County. A jury could find it obvious that failing to perform these services would likely result in dangerously deficient medical care, and, indeed, Corizon's own policies evidence that it understood these risks. *See Johnson v. Corizon Health, Inc.*, No. 6:13–cv–1855–TC, 2015 WL 1549257, at *10 (D. Or. Apr. 6, 2015) (relying on policies and contract to find the same). The record also reflects that Corizon was aware of issues with screening and staffing based on its monthly meetings with LCAC officials, *see* Brinson Decl., Ex. 56 at 1-13 (flagging issues); Ex. 58 (reminding Corizon staff to be "deliberate and intentional" in their rounds), and a jury could find it obvious that the combination of limiting ameliorative care and refusing outside transfers was a combustible mix. Lane County's participation in the monthly meetings, along with the standards it insisted upon in the contract, likewise suggest its awareness of these risks.

### D. Moving Force.

Finally, having found evidence that Corizon and Lane County had policies and customs reflecting their deliberate indifference to Mr. Fricano's serious medical need, the Court must consider whether a reasonable jury could find that these practices were the "moving force" behind Mr. Fricano's injuries. *Gibson*, 290 F.3d at 1196. A policy or custom is the moving force if it is "closely related to the ultimate injury." *Canton*, 489 U.S. at 391. To be closely related to the injury, a plaintiff must show "that the injury would have been avoided" had the entity employed an appropriate policy. *Oviatt v. Pearce,* 954 F.2d 1470, 1478 (9th Cir. 1992).

Here, a jury could find that the Corizon and Lane County practices are closely related to Mr. Fricano's prolonged psychosis and PTSD. To begin, it would be reasonable for a jury to

find that, had a Corizon medical professional screened Mr. Fricano prior to his booking at LCAC, his mania and psychosis would have been evident and resulted in transport to an appropriate medical facility. *See Gibson*, 290 F.3d at 1196 (finding the same under analogous circumstances). Indeed, when Mr. Fricano arrived at LCAC, he was accompanied by Ms. Kingsley's Director's Hold, which noted his recent change in medication, Brinson Decl., Ex. 10 at 6, and he was described as both "paranoid [and] delusional." Brinson Decl., Ex. 10 at 69; *see also* Ex. 20 at 1 (describing Mr. Fricano as at times "completely incoherent and unresponsive"). This is sufficient to find, in the words of Defendants' expert, that Mr. Fricano was experiencing "an acute mental health crisis that [could not] be treated within the correctional facility," and that he therefore required transfer to an outside facility. Sheldon Decl. ¶ 9. The same is true once Mr. Fricano was booked and examined by medical and mental health staff—a jury could find that he should have been transferred to receive outside care, *see generally* Brinson Decl., Ex. 29, "rather than face conditions that only made his outlook worse." *Gibson*, 290 F.3d at 1196.

Similarly, a reasonable jury could find that Corizon's failure to provide ameliorative care while at LCAC, including through Mr. Pleich, is also closely related to Mr. Fricano's prolonged psychosis and PTSD.[12] As addressed in Part I, Dr. Northway's Fitness to Proceed Evaluation, *see* Brinson Decl., Ex. 20 at 4, and Mr. Fricano's rapid improvement at Sacred Heart, *compare* Ex. 29 at 17 (diagnosing Mr. Fricano with "acute psychosis") *with* Ex. 29 at 43-46 (deeming Mr. Fricano fit for release), both suggest that further treatment, including appropriate staffing and supervision, would have resulted in a shorter or less intense period of psychosis. In addition, the treatment records of Dennis Viene, Ph.D., *see* Ex. 45 (diagnosing and describing PTSD), and the

---

[12] Defendants raise no arguments addressing overdetermined causation and, because a jury could find that only one of the alleged practices constitutes a cognizable custom or policy, the Court need not address whether deficient post-intake procedures may ever qualify as a moving force if they follow deficient pre-intake procedures.

expert report of Dr. Diamond, Talcott Decl., Ex. F at 12 (finding that "many of [Mr. Fricano's]

PTSD symptoms . . . are directly related to" his time at LCAC), support the conclusion that these

failings prolonged Mr. Fricano's psychosis and caused him to develop PTSD. Taken together, a

reasonable jury could find that Corizon's customs, as well as Lane County's ratification of those

customs, were the moving force behind Mr. Fricano's injuries.

## CONCLUSION

For the foregoing reasons, Defendants' joint motion for summary judgment is DENIED.

In addition, Corizon and Mr. Pleich's motion to strike is GRANTED in part and DENIED in

part. All reports, testimony, and other records to which Defendants object are allowed, except

for the legal conclusions contained in Dr. Diamond's report, which are stricken. Defendants may

renew and raise new objections, including *Daubert* challenges, in their pretrial filings.

IT IS SO ORDERED.

DATED this 8th day of June, 2018.

*/s/* Michael J. McShane
Michael J. McShane
United States District Judge